109 F.3d 1146
 154 L.R.R.M. (BNA) 2929, 133 Lab.Cas. P 11,818
 PIKEVILLE UNITED METHODIST HOSPITAL OF KENTUCKY, INC.,
Petitioner/Cross-Respondent,
v.
UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC, Intervenor,
National Labor Relations Board, Respondent/Cross-Petitioner.
 Nos. 95-6467, 95-6644.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 19, 1996.
Decided April 1, 1997.
 
 Tony C. Coleman, Raymond C. Haley, III (argued and briefed), Westfall, Talbott & Woods, Louisville, KY, for Petitioner/Cross-Respondent.
 Irwin H. Cutler, Jr. (argued and briefed), Segal, Isenburg, Sales, Stewart, Cutler & Tillman, Louisville, KY, for Intervenor.
 Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Charles P. Donnelly, Jr., William M. Bernstein (argued and briefed) National Labor Relations Board, Washington, D.C., for Respondent/Cross-Petitioner.
 Before: NELSON and DAUGHTREY, Circuit Judges; COHN, District Judge.*
 DAUGHTREY, Chief Judge.
 
 
 1
 Before us is a petition for review filed by the Pikeville United Methodist Hospital of Kentucky, Inc., and a cross-application filed by the National Labor Relations Board seeking enforcement of a Board order remedying various unfair labor practices found to have been committed by the hospital. In its petition, the hospital contends that it is an exempt employer under 29 U.S.C. § 152(2) and that the NLRB thus had no authority to review the unfair labor practice claims made against it. Pikeville United Methodist Hospital also insists that substantial evidence was not presented to the NLRB to justify the Board's findings regarding those alleged labor law violations. Because we conclude that the Board did have jurisdiction over the disputed claims and that substantial evidence in the record supported most, but not all, of the Board's findings, we hold that the Board's order must be enforced in part and set aside in part.
 
 I. PROCEDURAL AND FACTUAL BACKGROUND
 
 2
 A. Early Relationship Between City Of Pikeville And The Hospital
 
 
 3
 Pikeville United Methodist Hospital was originally incorporated in 1923 as the Methodist Hospital of Kentucky. Over the years, the hospital outgrew its facilities and required more modern premises to provide appropriate medical care to the public it served. Consequently, in the mid-1960's, Pikeville United Methodist Hospital purchased additional property on which its newer hospital now stands. The financing for the new facility was obtained in cooperation with the City of Pikeville, which created a holding company known as the Pikeville, Kentucky Public Hospital Corporation to issue bonds covering the costs of construction.
 
 
 4
 In consideration of the City's role in the provision of funds for building the new hospital, Pikeville United Methodist Hospital conveyed its ownership interest in the property to the City of Pikeville in fee simple. The City then re-conveyed the interest to the holding company, which leased the property back to the City. Finally, to complete the circle, the City of Pikeville sublet the hospital land and buildings to Pikeville United Methodist Hospital.[1] The City retained, however, the right to terminate the sublease to Pikeville United Methodist Hospital and the lease with the holding company upon 90 days' advance notice. Having created the holding company, the city also retained the power to approve and replace the directors of that entity. Other provisions of the sublease between the City and Pikeville United Methodist Hospital called for management of the hospital pursuant to the "directions of the City," deposit of all funds and revenues from the operation of the hospital into a revenue fund account of the city, and charging such rates for services and facilities "as are specified in the annual budget adopted by the City."
 
 
 5
 Despite the lease provisions calling for active municipal oversight and control of the Pikeville United Methodist Hospital operations, the actual practices under the sublease did not result in such a heightened level of involvement on the part of the City. In fact, as noted by an acting regional director of the NLRB in an earlier administrative proceeding involving Pikeville United Methodist Hospital:
 
 
 6
 The record discloses that the Employer submitted a proposed annual budget to the City for approval in accordance with the sublease requirements on one occasion in 1971, the year in which the leases were executed. Despite provisions requiring such actions, there have been no audits of hospital costs or City approval of rates for patient services. Prior to 1991 there is no evidence that the City was directly involved in the daily administration, operation or management of the hospital facility or influenced the Employer's labor relations.
 
 
 7
 Although the City did appoint the members of the board of the holding company, many of whom also served on the board of directors of Pikeville United Methodist Hospital,[2] other evidence also indicated that the City had no significant connection with the day-to-day activities of the hospital. Dr. John Tummons, who was appointed administrator of Pikeville United Methodist Hospital in late 1989, stated, for example, that he, not city officials, was responsible for the hospital's labor relations. He further elaborated by explaining that he had "final authority" regarding the establishment of wage rates for the hospital, the creation of new jobs at the facility, the content of those jobs, and "[a]ny changes in pay scales or the overall compensation system."
 
 
 8
 B. Labor Strife And Subsequent City-Hospital Relations
 
 
 9
 During the summer of 1990, the United Steelworkers of America began a drive to organize the non-professional employees of Pikeville United Methodist Hospital. Because of certain actions taken by the hospital during the campaign, however, the union filed a series of unfair labor practice charges between September 20, 1990, and November 19, 1990. The acting regional director of the NLRB, after reviewing the charges, issued a "Complaint and Notice of Hearing" echoing many of those allegations. In responding to the complaint, the hospital chose not to challenge the Board's jurisdiction to resolve the dispute.
 
 
 10
 Shortly thereafter, the NLRB began a hearing on unit determination issues involving this same labor dispute but docketed with a separate case number. Before the unit determination case could be completed, the NLRB ordered all of the previous unfair labor practice charges against Pikeville United Methodist Hospital consolidated and issued a new, amended complaint incorporating the earlier charges made against the hospital. When answering the new, amended complaint, the hospital, for the first time, claimed as a defense to the charges that the NLRB had no jurisdiction over it because Pikeville United Methodist Hospital did not "retain sufficient control over the employment relationship to engage in meaningful collective bargaining."
 
 
 11
 In an effort to document the claim that the City controlled the hospital's employment practices, and thus deprive the NLRB of jurisdiction, the Pikeville City Commission passed a resolution on January 14, 1991, that directed:[Pikeville United Methodist Hospital] shall not enter into any contract of employment, whether individually extended or collectively bargained, nor shall it modify wage rates, hours of work or any employee benefit, whether pursuant to a written plan or practice, without the express written consent of the City of Pikeville, Kentucky or its designated representative.
 
 
 12
 The City's efforts were initially crowned with success. In July 1991, the NLRB ruled in the unit determination case that, although Pikeville United Methodist Hospital is an "employer" for purposes of the National Labor Relations Act, the Board would not assert its jurisdiction over the hospital. Relying upon its decision in Res-Care, Inc., 280 NLRB 670, 1986 WL 53982 (1986), the NLRB determined that the recently-passed municipal resolution sufficiently deprived the hospital of control over employment conditions so as to foreclose the possibility that the employer could engage in meaningful negotiations with employees. Because no such fruitful bargaining could occur, the Board concluded that holding the hospital responsible for correction of any labor problems would be futile.
 
 
 13
 On July 8, 1994, however, before addressing the unfair labor practice issues before him in the second Pikeville United Methodist Hospital case, an administrative law judge revisited the regional director's earlier jurisdictional ruling made in the unit determination portion of this labor dispute. In doing so, the administrative law judge concluded that the January 14 resolution of the Pikeville City Commission was a "sham transaction" and that the City still did not assert meaningful control or oversight over the hospital's labor relations activities.
 
 
 14
 The administrative law judge also determined that, regardless of the outcome of an application of the Res-Care, Inc. analysis, the NLRB could address the unfair labor practices alleged to have occurred prior to passage of the January 14 resolution because "[i]t is clear that the employees of the Hospital had every right to believe that the Board had jurisdiction over the Respondent at the time of the commission of the unfair labor practices." Furthermore, because prior administrative decisions of the NLRB established that the Board itself is not precluded from reconsidering its own earlier actions, the administrative law judge found that the earlier ruling on the Board's jurisdiction over Pikeville United Methodist Hospital in the unit determination case did not foreclose revisiting that issue in a subsequent proceeding.[3]
 
 
 15
 Finally, after justifying his exercise of jurisdiction in this matter, the administrative law judge found substantial evidence in the record to support a number of the unfair labor practice allegations made against the hospital. He therefore ordered Pikeville United Methodist Hospital to cease and desist from engaging in such practices and further ordered that certain affirmative actions be taken to remedy injuries suffered by employees as a result of the hospital's actions.
 
 
 16
 A panel of the NLRB adopted the recommendations of the administrative law judge and in turn ordered that the injunctive and affirmative relief detailed in the administrative law judge's decision be implemented. In doing so, however, the Board concluded that its recent decision in Management Training Corp., 317 NLRB 1355, 1995 WL 451936 (1995), overruled Res-Care, Inc. and, thus, rather than relying upon a Res-Care, Inc. analysis, focused its inquiry on only two questions: (1) whether the employer meets the definition of an "employer" contained in § 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2), and (2) whether the employer meets applicable monetary jurisdictional standards. Finding that Pikeville United Methodist Hospital did indeed satisfy those criteria, the NLRB ruled that the Board could properly exercise jurisdiction over the hospital in this matter. Concurring in the findings of the administrative law judge, the NLRB ruled, in the alternative, that the Board's exercise of jurisdiction is proper even under the Res-Care, Inc. standard. The Board also held that, in any event, it could exercise jurisdiction here "for the limited purpose of remedying the unfair labor practices, which occurred several months before the Pikeville City Commission attempted, albeit unsuccessfully, to remove the Board's jurisdiction by passing the January 14, 1991 resolution."
 
 II. JURISDICTION
 A. Statutory Basis For Jurisdiction
 
 17
 Before this court, Pikeville United Methodist Hospital first contends that the NLRB erred in exercising jurisdiction over a labor dispute involving the hospital. An "employer" subject to regulation by the Board under the National Labor Relations Act is, however, defined to include:
 
 
 18
 ... any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C.A. § 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.
 
 
 19
 29 U.S.C. § 152(2).
 
 
 20
 Despite the broad reach of the statute, Pikeville United Methodist Hospital argues that this definitional provision necessarily exempts the hospital from the Act's coverage because the lease signed by the hospital and the City vested such total control of the hospital's activities in the City that Pikeville United Methodist Hospital itself became a political subdivision of the State of Kentucky. As held by the Supreme Court, however, a hospital like Pikeville United Methodist Hospital may be statutorily exempt from the jurisdiction of the NLRB only if it is either "(1) created directly by the state, so as to constitute [a] department[ ] or administrative arm[ ] of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn., 402 U.S. 600, 604-05, 91 S.Ct. 1746, 1749, 29 L.Ed.2d 206 (1971).
 
 
 21
 Pikeville United Methodist Hospital appropriately concedes that it was not "created directly by the state." Rather, it recognizes that it was instead incorporated as a private business entity more than 70 years ago. The germane inquiry in this dispute concerning the statutory exemption of the hospital thus centers around the issue of whether the hospital administrators are, in fact and by necessity, responsible to public officials for their actions. The hospital suggests an affirmative response to such a question by virtue of the fact that the City of Pikeville must appoint the members of the board of directors of the holding company, some of whom also happen to sit on the hospital's board. No law or ordinance, however, requires that the board of directors of Pikeville United Methodist Hospital be elected by the general populace or requires that those board members be public officials also serving on the board of the holding company. In fact, many individual hospital board members who are responsible for administration of Pikeville United Methodist Hospital have no connection whatsoever with the holding company board of directors or with the Pikeville municipal government. The record in this matter contains absolutely no evidence to support the contention that the City of Pikeville has authority to control the membership of the hospital's board of directors. Because it thus possesses neither of the recognized attributes of a statutorily exempt employer, Pikeville United Methodist Hospital may not rely upon that argument to place itself beyond the jurisdictional reach of the NLRB.
 
 B. Discretionary Basis For Jurisdiction
 
 22
 Even though the hospital may not fall neatly within the explicit statutory exemption from Board coverage, Pikeville United Methodist Hospital argues that the control exercised by the City over the hospital's labor relationships should nevertheless lead the Board to exercise its discretion to refrain from asserting jurisdiction in this case. It is true that in some instances, the NLRB may, in its own discretion, choose not to exercise the jurisdiction that it may otherwise invoke. It is the NLRB alone, however, that "has discretion whether to exercise jurisdiction." Crestline Memorial Hosp. Ass'n, Inc. v. NLRB, 668 F.2d 243, 244 (6th Cir.1982). Thus, "absent a showing that [the Board] acted unfairly and caused substantial prejudice to the affected employer," a reviewing court should not disturb the NLRB's discretionary decision concerning assertion of that oversight. Human Development Ass'n v. NLRB, 937 F.2d 657, 661 (D.C.Cir.1991) (quoting NLRB v. Parents & Friends of the Specialized Living Center, 879 F.2d 1442, 1448 (7th Cir.1989)).
 
 
 23
 Because it cannot "treat similar situations in dissimilar ways," Burinskas v. NLRB, 357 F.2d 822, 827 (D.C.Cir.1966), the NLRB has attempted to develop a coherent policy governing its jurisdictional decisions. In 1986, therefore, the Board ruled that it would decide whether to exercise its jurisdiction over certain private employers who contracted with exempt entities for the provision of services by examining "not only the control over essential terms and conditions of employment retained by the employer, but also the scope and degree of control exercised by the exempt entity over the employer's labor relations, to determine whether the employer in issue is capable of engaging in meaningful collective bargaining." Res-Care, Inc., 280 NLRB at 672. In 1995, however, the Board abandoned the litigation-intensive Res-Care, Inc. analysis and, in Management Training Corp., instead decided "to assert jurisdiction whenever an employer technically falls within the statutory definition, regardless of whether an exempt political subdivision actually controls the employment terms." ARA Services, Inc. v. NLRB, 71 F.3d 129, 134-35 (4th Cir.1995).
 
 
 24
 1. Exercise Of Discretionary Jurisdiction Under Management
 
 
 25
 Training, Inc.
 
 
 26
 Under a Management Training Corp. analysis, the jurisdiction of the NLRB over Pikeville United Methodist Hospital is established simply by the minimal showing that the hospital both "meets the definition of 'employer' under Section 2(2) of the Act," and "meets the applicable monetary jurisdictional standards."[4] 317 NLRB at 1358. In fact, the new discretionary jurisdictional standard is so broad that the hospital does not even attempt to argue before this court that it does not meet the appropriate criteria of the new test. Instead, the hospital attacks the analysis by submitting that the NLRB was without authority to abandon the Res-Care, Inc. standard and substitute the new one.
 
 
 27
 2. Authority Of NLRB To Modify Discretionary Jurisdiction Standard
 
 
 28
 In making such an argument, the hospital insists that the Res-Care, Inc. "control" standard is mandated by § 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2), and that the Management Training Corp. test thus violates that statutory provision. As noted above, however, § 2(2) simply and straightforwardly exempts only certain named governmental units and other organizations from the reach of the NLRB. Nor did the Supreme Court's NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn. decision incorporate the idea of the Res-Care, Inc. "control" standard into its two-pronged statutory exemption analysis. 402 U.S. at 604-05, 91 S.Ct. at 1749-50.
 
 
 29
 Instead, as argued by the Board before this court, the "control" test elucidated in Res-Care, Inc. is only a tool previously used by the Board to define the parameters of the agency's discretionary, as opposed to statutory, jurisdiction. Only after jurisdiction pursuant to § 2(2) was established would the Board examine the control exercised by the employer over aspects of employment conditions to determine whether the NLRB would nevertheless choose to forego examination of alleged labor law violations.[5]
 
 
 30
 Moreover, the Board has offered a supportable rationale for its decision to alter the Res-Care, Inc. standard. As stated in Management Training Corp., "[i]t was shortsighted ... for the Board to declare [in Res-Care, Inc.] that bargaining is meaningless unless it includes the entire range of economic issues." Management Training Corp., 317 NLRB at 1357. In today's labor market, the economic packages offered to employees are no longer the sole prizes of a bargaining event.
 
 
 31
 In times of downsizing, recession, low profits, or when economic growth is uncertain or doubtful, economic gains at the bargaining table are minimal at best. Here the focus of negotiations may be upon such matters as job security, job classifications, employer flexibility in assignments, employee involvement or participation and the like.
 
 
 32
 Id. We hold that the Res-Care, Inc. standard was not statutorily mandated and that the Board did not contravene § 2(2) in applying Management Training Corp. to the facts of this case.
 
 
 33
 The Fourth Circuit has recently adopted an identical position in Teledyne Econ. Dev. v. NLRB, 108 F.3d 56, 59 (4th Cir.1997). In Teledyne, the court recognized that adoption of the Res-Care, Inc. standard was not statutorily mandated, but instead, was merely an exercise of the discretion granted the Board by Congress. Consequently, when the agency decides to reverse its course and "assert its jurisdiction rather than recognizing an exemption not compelled by section 2(2), the Board is within its authority." Id. (footnote omitted).
 
 III. UNFAIR LABOR PRACTICES
 
 34
 In considering NLRB decisions concerning unfair labor practices, this court employs the standard of review delineated in 29 U.S.C. § 160(e). Pursuant to that statutory directive, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Id.
 
 A. Uncontested Findings
 
 35
 During the administrative phase of these proceedings, the administrative law judge and NLRB found that Pikeville United Methodist Hospital committed four unfair labor practices that are not now contested before this court. Specifically, the Board determined that violations of the National Labor Relations Act occurred when employee Judy Webb was given an uncharacteristically poor work evaluation solely because of her union activities, when employee Robin Gray was threatened by her supervisor that she "could be replaced by someone from the street" unless she began expressing anti-union sentiments, when union discussions between employees were forbidden at lunch time, and when the hospital commissioned surveillance teams, or "rat patrols," to roam through the hospital monitoring the employees for any evidence of union sympathizing or labor discussions.
 
 B. Contested Findings
 
 36
 1. Solicitation Of Grievances Through Commissioned Survey
 
 
 37
 The administrative law judge and NLRB also concluded that Pikeville United Methodist Hospital violated the provisions of 29 U.S.C. § 158(a)(1)[6] by hiring SESCO, an outside consulting firm, to conduct a survey of employee attitudes and grievances. The hospital insists that solicitation of grievances after commencement of a union organizing campaign is improper only if it is meaningfully different from pre-campaign solicitation and that here, the requests made to employees to list complaints and concerns were no different from the active grievance solicitation previously conducted by John Tummons, the hospital administrator. The hospital further contends that the record contains no evidence to support a conclusion that the SESCO survey post-dates the hospital's knowledge of the employees' organizing activities.
 
 
 38
 As stated by the administrative law judge, however, the record in this matter conclusively supports the finding that hospital employees informed Tummons on July 30, 1990, of their intention to seek union representation and SESCO did not initiate its survey until early August.[7] Moreover, Pikeville United Methodist Hospital had not conducted a similar survey since 1982 and one hospital employee was told by a person distributing the survey that the purpose of the polling was "to see what the problems were so they might could work on them," and that although nothing was done in response to the earlier survey, "Dr. Tummons was going to do something about this survey."
 
 
 39
 It is undisputed that Dr. Tummons conducted regular discussions with employees to solicit their input on working conditions at Pikeville United Methodist Hospital. Nevertheless, the breadth and scope of the SESCO survey, coming eight years after the most recent similar grievance solicitation and only after hospital administrators learned of the employees' desire to organize was clearly a substantive change in the nature of the hospital's responsiveness to grievances. Furthermore, the timing of that change, coming as it did only a week after communication of the employees' desire for union representation, leads to the natural inference that the increased concern was improperly precipitated by the threat of union activity. This court may not displace reasonable inferences of the Board. NLRB v. Ohio Masonic Home, 892 F.2d 449, 451 (6th Cir.1989). Thus, because such a response by the hospital to the organizational efforts is in violation of 29 U.S.C. § 158(a)(1), the Board was justified in finding that the commissioning of the SESCO survey constituted an unfair labor practice. See Carbonneau Indus., Inc., 228 NLRB 597, 598-99, 1977 WL 8432 (1977). See also NLRB v. Naum Bros., Inc., 637 F.2d 589, 591 (6th Cir.1981) (per curiam).
 
 2. Discharge Of Employee Robin Gray
 
 40
 The hospital next submits that the record does not support the administrative law judge's and Board's conclusions that Robin Gray was threatened, suspended, and discharged in retaliation for her pro-union stance. Gray was employed as a ward clerk in the special care nursery of Pikeville United Methodist Hospital. Once the organizational campaign began, she signed a union card but was told by her supervisor, Cheryl Hickman, that "the union was trouble and ... only wanted in to ... the hospital to make their wages larger because of the dues that all the employees would have to pay." Hickman also told Gray that "if people signed union cards, it was trouble," and continually asked the employee whether she had retrieved her union card from the union organizer. Approximately a month later, Gray was told by Hickman and by Phyllis Bowling, another supervisor, "not to be discussing anything ... concerning the union anymore because it was disruptive with other co-workers." Shortly after that, Bowling made a comment to Gray that she "had better be anti-union because [her] job could be replaced by someone from the street."
 
 
 41
 On November 7, 1990, Gray used approximately 15 minutes of her 30-minute lunch break before receiving permission from Brenda Chapman, one of her immediate supervisors, to retrieve a package of photographs that had been developed at a local store. When Gray returned to work roughly 25 minutes later, she was told to report to a different floor for work at a desk. She admitted that she had neither clocked out of the hospital as she left on her errand nor clocked in as she returned. Furthermore, she claimed that no one commented to her about her time card until the following afternoon when Hickman told Gray that Brenda Chapman had ordered Gray to clock out prior to leaving for her pictures the previous day. Gray responded that she had not heard Chapman make such a request, but would be happy to note her absence from the hospital on her time card. She was informed, however, that "it was too late" and that she would be suspended without pay pending an investigation.
 
 
 42
 When Gray was finally called to return to the hospital, she was told that she was to be dismissed for insubordination. Before the administrative law judge, she explained that she was surprised by the retributive action because she, as well as other employees, had many times before run brief outside errands without clocking out and without being told they must clock out.
 
 
 43
 Pikeville United Methodist Hospital offered evidence that it did indeed have a written policy requiring employees to check out of the facility "[i]f it is necessary for an employee to leave the Hospital before completion of the shift." Additionally, Hickman and Chapman testified that they had granted permission to Gray to leave the hospital to run errands on November 5 and November 7, respectively, on the condition that Gray clock out before leaving. Employee Mitzi Thacker also testified that she overheard Chapman informing Gray that she must clock out prior to running her errand on November 7.
 
 
 44
 Despite the quantity of the evidence submitted in opposition to Gray's account of the events of November 5-7, the administrative law judge chose to credit Gray's version of the events. The administrative law judge made a specific finding that, based upon his observation of Gray, he found her a more credible witness than Chapman, Hickman, and Thacker. He also concluded that the discharge of the employee over the time-card flap was further evidence of the hospital's anti-union animus, because the drastic punishment resulted from a monetary loss to the hospital of less than $10, and because no other employee had ever been so disciplined, even though ample evidence was presented that other personnel were also guilty of failing to clock out for midday errands. Such a reasonable inference may not be displaced by a reviewing court. NLRB v. Ohio Masonic Home, 892 F.2d at 451.
 
 
 45
 Although this court may have weighed the evidence presented differently on de novo review, it is clear that substantial evidence in the record does support the administrative law judge's decision on this unfair practice allegation. Consequently, the Board's finding of violations based upon the threats to and the discharge of Robin Gray as a result of the employee's union activities is entitled to enforcement.
 
 
 46
 3. Adverse Job Actions Taken Against Rapunzel Hall
 
 
 47
 In the fall of 1990, Rapunzel ("Raps") Hall, a pharmacy technician at Pikeville United Methodist Hospital and an otherwise excellent employee, was presented with a blistering reprimand from her boss, Patricia McCoy. Hall's duties were also altered at that time, moving her from a position that she claimed to enjoy immensely. All parties to this labor dispute agree that the adverse job action followed an incident in the pharmacy involving a misplaced inventory sheet. Because McCoy did not know that the sheet could be located in her cluttered office, she ordered the staff to work overtime to reconstruct the information that should have been included in the report. After finding the original sheet, McCoy accused Hall of hiding information about its existence to the detriment of the hospital. Hall maintained that had she known McCoy was looking for the same information that Hall had already provided to her, she would have alerted her boss to the sheet's existence.
 
 
 48
 The administrative law judge noted that Hall was a "very credible witness" and thus chose to believe her account of the misunderstanding. He thus concluded that the job actions taken against Hall resulted from the fact that Hall was an active participant in the union's organizational campaign. The hospital nevertheless insists that the resultant finding of unfair labor practices cannot be sustained because no evidence exists in the record to indicate that McCoy, the individual who initiated the discipline and criticism of Hall, was aware of Hall's union activity.
 
 
 49
 It is true that no direct evidence of McCoy' knowledge of Hall's union leanings is contained in the record now before the court. Testimony offered before the administrative law judge does establish, however, that McCoy and Roy Reeser, Hall's immediate supervisor, discussed with each other their dislike of evening duty on the hospital surveillance teams charged with the duty to squelch pro-union conversations and activities at Pikeville United Methodist Hospital. Furthermore, Hall stated that Reeser also mentioned directly to her, "Raps, it's because of you [that we are subjected to the surveillance duty]." Based upon such evidence, it is reasonable to infer that McCoy, like Reeser, her subordinate, was aware of Hall's support of the union at the time she was disciplined. Because this court may not displace any such reasonable inference, the finding of additional unfair labor practices against Pikeville United Methodist Hospital based upon the treatment of Rapunzel Hall should also be enforced. See NLRB v. Ohio Masonic Home, 892 F.2d at 451.
 
 
 50
 4. Discriminatory Enforcement Of Posting Rules
 
 
 51
 The hospital next submits that the record does not contain substantial evidence to support the administrative finding that Pikeville United Methodist Hospital discriminatorily enforced its policy forbidding posting of non-work-related materials in the hospital. As stated by this court in Union Carbide Corp. v. NLRB, 714 F.2d at 660:
 
 
 52
 The Labor Management Relations Act does not afford employees a protectable interest in the use of an employer's bulletin board. Nevertheless, where, by policy or practice, the company permits employee access to bulletin boards for any purpose, section 7 of the Act, 29 U.S.C. section 157, secures the employees' right to post union materials.
 
 
 53
 (Citations omitted.)
 
 
 54
 Although the hospital does not deny that non-union, non-work material was posted on bulletin boards throughout the hospital, it argues that there is no evidence to suggest that such material was permitted after issuance of a June 27, 1990, pre-organizational campaign policy forbidding posting of non-work material. Many of the witnesses upon whose testimony the administrative law judge relied to support his finding of a discriminatory posting policy did give only vague references to materials being posted "before the campaign started" in August 1990 and "in 1990." Other witnesses offered more date-specific evidence, however. For example, Amanda Hawkins testified that "at the time the union activity started" in late-July or early-August of 1990, wedding and shower invitations, vacation cards, and marriage notices were posted on the boards. Only after the onset of union activity were such postings removed. Lisa Ann Smith stated that it was not until August 19, 1990, that hospital personnel forbade the posting of non-work items on the bulletin boards. Jeff Williamson and Bruce White also stated that non-union, non-work items were posted on hospital bulletin boards until September or October 1990. Again, it appears that only after a crackdown on the display of union literature were the other non-work materials ordered removed.
 
 
 55
 In short, substantial evidence exists in the record to support the administrative law judge's and the Board's findings that Pikeville United Methodist Hospital maintained different policies regarding the posting of non-work materials on hospital bulletin boards before and after the onset of union organizing activities at the hospital. Specifically, only after union literature was posted throughout the hospital on the employee bulletin boards was the employer's "non-work material" posting ban enforced. The finding of an unfair labor practice in this regard must, therefore, also be upheld.
 
 
 56
 5. Threatening Of Employee Thacker For Handbilling
 
 
 57
 On the morning of October 15, 1990, Ruth Thacker was passing out union leaflets when Ron White, the housekeeping supervisor, arrived with two security guards and asked Thacker and the other handbillers to move to the street and away from the hospital entrance while distributing their materials. Thacker did so, but was later approached by the guards who asked her name. Although she did not answer the question posed, she and guards engaged in pleasant conversation for approximately 15 minutes. The guards even offered the use of an umbrella to shield her from the light rain that was falling at the time.
 
 
 58
 Thacker eventually ceased her handbilling to begin her shift. After she had clocked in, however, White again approached her and asked her to identify herself. When she inquired as to the reason for the request, White simply asked again for her name. She again refused, pointed to her manager, and stated, "You can ask her." White did so, learned Thacker's identity, and immediately asked to speak with a hospital director. After being informed that the director was unavailable at that time, White left the area.
 
 
 59
 The administrative law judge and the Board determined that the actions of White and the security guards in attempting to ascertain a handbiller's name, and then, in the presence of the employee, asking to speak with the director, amounted to illegal coercion, in violation of the National Labor Relations Act's safeguarding of protected labor activity. Pikeville United Methodist Hospital insists that merely asking an employee her name cannot amount to coercion and, in support of that position, cites prior Board decisions in Rossmore House, 269 NLRB 1176, 1984 WL 36297 (1984), aff'd, 760 F.2d 1006 (9th Cir.1985), and St. Clair Memorial Hosp., 309 NLRB 738, 1992 WL 370178 (1992).
 
 
 60
 Both Rossmore House and St. Clair Memorial Hosp., however, are factually distinguishable from the case now before this court. In Rossmore House, for example, the questioning of the employee entailed only cursory inquiries into whether a union organizing effort was underway. No threats, express or implied, other than that the employers would most likely fight the unionization effort, were made to the employee. Id. at 1176. In St. Clair Memorial Hosp., the "interrogation" of individuals concerning their identities was an attempt only to ascertain whether those persons were employees or non-employees, and thus, whether they were permitted to engage in handbilling on the employer's property. Once the information was obtained, no additional threats were made or actions taken. Id. at 739.
 
 
 61
 In contrast, Ron White knew in this case that Ruth Thacker was an employee of Pikeville United Methodist Hospital. In fact, he followed her to her work station, obtained her name from a co-worker, and then made the pretense of seeking an audience with Thacker's supervisor. Because of the implied threat that a report would be made to Thacker's supervisor as a result of the employee's handbilling activities, and because of the coercion inherent in such a scenario, we cannot say that the Board erred in adopting the administrative law judge's determination that such acts constituted an unfair labor practice.
 
 
 62
 6. Order To Cease Handbilling At Hospital Entrances
 
 
 63
 The Board further found that Pikeville United Methodist Hospital committed an unfair labor practice in ordering employees not to distribute handbills at the entrances to the hospital. In so concluding, the Board and the administrative law judge assumed that "on several occasions during the campaign," employees distributing handbills during non-work hours were ordered off hospital property without any evidence that the handbillers were blocking ingress to or egress from the hospital. In challenging that determination, the hospital asserts that the areas from which the employees were expelled were actually work areas from which union activity can be restricted.
 
 
 64
 The record before this court indicates that the "several occasions" to which the administrative law judge's decision refers actually involved only one instance in which pro-union employees distributed handbills at both the front and back entrances to the hospital. While testimony was elicited that daily deliveries were made to the back door of the hospital, no evidence was adduced that the parking lot area near the rear entrance where the handbillers massed was a "work area." Without additional evidence of that fact, or of whether the handbillers restricted ingress to or egress from the hospital, we decline to speculate as to possible effects of the described activity, and conclude that the Board's order finding the restriction on handbilling at the back entrance to be an unfair labor practice was supported by substantial evidence.
 
 
 65
 On the other hand, the appellate record does not contain substantial evidence to support the Board's findings regarding the handbilling at the front entrance to the hospital. Although the evidence supports the handbillers' claims that they did not block the actual entrance to the hospital, testimony also indicates that individuals assembled "in the area" where patients are dropped off and picked up. Because the handbilling was thus occurring in a work area, Pikeville United Methodist Hospital could properly request that those individuals distributing the information leave the immediate vicinity. The Board's order concerning the finding of an unfair labor practice in restricting handbilling at the front entrance to the hospital should not, therefore, be enforced.
 
 
 66
 7. Ordering Off-Duty Nurse To Leave Premises
 
 
 67
 Finally, Pikeville United Methodist Hospital argues that the Board erred in holding that a hospital order that off-duty nurse Jeff Williamson leave the building was a violation of the National Labor Relations Act. The Board counters by insisting that an employer may not ban an off-duty employee from non-work areas absent valid justification.
 
 
 68
 This issue centers around an incident in which Williamson, after the beginning of the organizational campaign, was at the hospital, off-duty, talking with friends in the cafeteria. Later, while walking through the lobby, he saw a supervisor, Patty Akers, who asked him why he was in the building. Caught by surprise, Williamson stated falsely that he was in the hospital to visit the mother of a co-worker. Akers took no action at that time to remove Williamson from the premises. Still later, however, Williamson encountered Akers again, this time as Williamson was walking through the emergency room. Akers took that opportunity to inform him that she had learned that the previously-discussed co-worker's mother had been discharged the previous day. Then, as Williamson walked down the back hall of the building, he was approached by security personnel, who related that Akers had requested that he be asked to leave because he was off-duty, out of uniform, and had no legitimate business in the hospital at that time.
 
 
 69
 The Board predicated its finding of an unfair labor practice in this regard on its guidelines protecting "the right of off-duty employees to express their interest in unions to employees on other shifts." The record now before this court, however, contains absolutely no evidence that Williamson remained at the hospital to discuss labor relations or other union activities. Absent even an allegation that Akers infringed upon such a protected activity, we conclude that the Board erred in finding that this hospital decision constituted an unfair labor practice. Consequently, we must deny enforcement of that portion of the NLRB's order that finds a labor law violation in the request that Williamson leave the emergency room area while off-duty.
 
 IV. CONCLUSION
 
 70
 For the reasons stated above, we conclude that the NLRB properly exercised jurisdiction over Pikeville United Methodist Hospital in this matter. Moreover, substantial evidence supports most of the Board's findings of unfair labor practices committed by the hospital. However, the record does not contain substantial evidence to support the conclusion that an off-duty employee was asked to leave the premises because of his connection with the organizational campaign or that employee handbilling should have been permitted in the work area near the front entrance to the hospital. We therefore order that the Board's order be ENFORCED IN PART AND SET ASIDE IN PART.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 This convoluted "holding company bond issue" procedure was utilized to avoid the strictures of Section 157 of the Constitution of Kentucky which places severe limitations on the incurrence of indebtedness by any "county, city, town, taxing district, or other municipality."
 
 
 [2]
 In fact, until sometime in 1990, all members of the holding company's board of directors were also members of the much larger board of directors of Pikeville United Methodist Hospital
 
 
 [3]
 The administrative law judge also held that passage of the January 14 resolution was preempted by the National Labor Relations Act's prohibition of any restriction of employees' rights to bargain collectively
 
 
 [4]
 In limiting its jurisdictional reach to disputes involving entities "engaged in commerce," the NLRB established discretionary monetary jurisdictional amounts for various categories of businesses. To be considered "engaged in commerce," hospitals, for example, must have gross annual revenues of at least $250,000 and interstate commercial transactions of at least $50,000 per year. See, e.g., Waimea Dispensary, Inc., 218 NLRB 1337, 1975 WL 5698 (1975)
 
 
 [5]
 The Res-Care, Inc. decision itself, in carefully selected language, repeatedly speaks of the Board's declination of the assertion of jurisdiction. Res-Care, Inc., 280 NLRB at 670, 674. Had the Res-Care, Inc. test been based upon the statutory mandates of § 2(2), the NLRB would not have been in a position to "decline" jurisdiction; rather, the Board would have had no discretion in the matter whatsoever
 
 
 [6]
 29 U.S.C. § 158(a)(1) provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights [to self-organization, collective bargaining, and concerted activity for the purpose of collective bargaining or other mutual aid or protection]."
 
 
 [7]
 Although one of five witnesses involved with the presentation of the request for representation to Tummons stated that the request may not have been delivered until mid-August, the administrative law judge explained that the witness was uncertain about that and other relevant dates throughout his testimony. Consequently, the administrative law judge chose to credit the account offered by the other four witnesses on this matter. "[T]he assignment of credibility to witnesses is the prerogative of the Board." Union Carbide Corp. v. NLRB, 714 F.2d 657, 660 (6th Cir.1983)