**MAYFLOWER CONTRACT SERVICES, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 92–1696, 92–2004.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1992.

Decided Jan. 4, 1993.

**1222**

R. Michael Lowenbaum, St. Louis, MO, argued (Lee T. Paterson and Brent M. Giddens, on brief), for petitioner.

Margaret G. Bezou, DC, argued, for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BATTEY,* District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Four cities in California have jointly formed an agency, the Pomona Valley Transportation Authority, to provide transportation services for their citizens. That joint agency and the federal government fund a nonprofit corporation called Pomona Valley Community Services, which provides transportation services for the elderly and disabled. In early 1990, the joint agency and the nonprofit corporation advertised for bids from private contractors to provide transit service in connection with two programs—one for transit service in general and one for transit service for the elderly and disabled in particular. Mayflower Contract Services bid on the project and was awarded the contract. Under the contract provisions, Mayflower essentially operates a bus system for the two contracting entities and provides dispatchers, drivers, and mechanics.

In 1991, the International Brotherhood of Teamsters petitioned the National Labor Relations Board (NLRB) for certification as the collective bargaining representative for the dispatchers, the drivers, and the mechanics working for the bus system operated by Mayflower. After a hearing, the regional director of the NLRB found that the bargaining unit should be comprised of the drivers and the mechanics; the regional director of the NLRB also ordered that an election be held to determine whether the workers desired union representation. The workers subsequently chose the Teamsters as their union, and the NLRB certified Local 986 of the Teamsters as the collective bargaining representative for the drivers and the mechanics at Mayflower.

The union asked Mayflower to begin collective bargaining negotiations and requested various information relevant to the anticipated negotiations. Mayflower refused to provide the information and refused to bargain. In late 1991, the union filed unfair labor practice charges with the NLRB against Mayflower. The general counsel for the NLRB subsequently filed a formal complaint with the NLRB against Mayflower. A three-member panel of the NLRB found for the union and ordered Mayflower to bargain. Mayflower peti-

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

tions for review of that order; the NLRB cross-applies for enforcement of its order.

There are two issues on appeal—whether the NLRB properly asserted jurisdiction over Mayflower's labor relations with its employees, and, if so, whether the NLRB properly determined that the drivers and the mechanics should be in the same bargaining unit. We affirm the NLRB's decision, and we grant the NLRB's application for enforcement of its order.

## I.

 It is evidently undisputed by the parties that the joint agency and the non-profit corporation are governmental subdivisions and that the NLRB therefore has no jurisdiction over the labor relations between those entities and their own employees. *See* 29 U.S.C. § 152(2); *see also* 29 U.S.C. § 158(a), § 160(a). The question here is whether these two entities exempted from NLRB jurisdiction nonetheless exert so much control through their contract with Mayflower that Mayflower itself has effectively lost the power to bargain collectively with a union over the employment conditions of Mayflower's employees. If Mayflower has in fact effectively been deprived of that power by its contract with the two exempt entities, then it would be an abuse of discretion for the NLRB to assert jurisdiction over Mayflower's labor relations with its employees. *See, e.g., National Labor Relations Board v. E.C. Atkins and Co.*, 331 U.S. 398, 412–14, 67 S.Ct. 1265, 1272–74, 91 L.Ed. 1563 (1947), and *St. Jude Industrial Park Board v. National Labor Relations Board*, 760 F.2d 223, 226 (8th Cir.1985); *see also National Labor Relations Board v. St. Louis Comprehensive Neighborhood Health Center, Inc.*, 633 F.2d 1268, 1270, 1272 (8th Cir. 1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981), and *National Transportation Service, Inc.*, 240 N.L.R.B. 565 (1979).

The "jurisdictional inquiry" conducted by the NLRB is necessarily "fact-intensive." *Human Development Association v. National Labor Relations Board*, 937 F.2d 657, 661 (D.C.Cir.1991), *cert. denied*, ——

U.S. ——, ——, 112 S.Ct. 1512, 1513, 117 L.Ed.2d 649 (1992). However, the NLRB is "bound by its own rules" in deciding whether to assert jurisdiction over an employer who provides services to an exempt entity, *National Labor Relations Board v. Kemmerer Village, Inc.*, 907 F.2d 661, 663 (7th Cir.1990), so it is useful to consult NLRB decisions in similar cases. Nonetheless, "[r]eview of the NLRB's assertion of jurisdiction ... must be on a case-by-case basis." *National Labor Relations Board v. Parents and Friends of the Specialized Living Center*, 879 F.2d 1442, 1455 (7th Cir.1989).

The two most significant NLRB decisions addressing this question are *Long Stretch Youth Home, Inc.*, 280 N.L.R.B. 678 (1986), in which the NLRB asserted jurisdiction, and *Res–Care, Inc.*, 280 N.L.R.B. 670 (1986), in which the NLRB declined jurisdiction. The basic disagreement between the parties is about whether the circumstances in this case are closer to those in *Long Stretch Youth Home, Inc.* or *Res–Care, Inc.*

In *Long Stretch Youth Home, Inc.*, the NLRB considered whether to assert jurisdiction over a nonprofit corporation, licensed as a child care institution, that operated residential facilities for juveniles. The youth home submitted a proposed operating budget annually to the state, projecting income and expenses and specifying how its budget would be allocated among medical services, education, social services, and room and board. The state issued suggested guidelines for minimum and maximum employee salaries, but these guidelines were not mandatory; the actual amounts paid were set by the youth home. The state also had a policy that salaries should not exceed 65 percent of a child care institution's gross operating budget, but this policy was not a requirement and was not enforced as such. The youth home decided on its own personnel policies. The state reviewed the proposed budget and combined those figures with the proposed budgets of other child care institutions in devising its annual funding request to the legislature. Once the legislature appropri-

ated an amount for child care institutions, the state determined an appropriate per-child allotment for each child care institution.

The NLRB found that in these circumstances, jurisdiction was appropriate. In its decision, the NLRB cited as significant the fact that "the [state's] authority [was] in reality limited to suggesting salary guidelines and ensuring [that] certain benefits [were] provided" and that the state's authority did not "include the discretion to approve or disapprove specific salary or benefit levels." *Long Stretch Youth Home, Inc.*, 280 N.L.R.B. at 678 n. 12. The NLRB also noted that "in this case the wage and benefit levels approved by the [state were] not directly tied to funding." *Id.* at 678. The NLRB declared, moreover, that "the fact that the government entity places an effective ceiling on [employee salary] expenditures by limiting the private employer's total budget is not the type of control over labor relations that would cause us to decline to assert jurisdiction." *Id.* at 678 n. 14.

In *Res–Care, Inc.*, the NLRB considered whether to assert jurisdiction over a for-profit corporation that operated residential job corps centers for the federal government. Under the corporation's contract, the U.S. Department of Labor was to approve the job classifications, the wage ranges, the salary schedule, the personnel policies, and the employee benefits to be offered. Any proposed changes in the approved salary schedule or fringe benefit plans had to be submitted for approval. The contract contained percentage restrictions on the amounts payable to employees, based on their previous salary history and on the wages paid by other employers for similar work in the same geographical area. Any deviation from these requirements had to be authorized by a waiver obtained from the government. Compensation to the employer was on a "cost-plus-fixed-fee basis. The total contract price, including the fixed fee, [was] derived from the line-by-line operating budget ... approved" by the government. *Res–Care, Inc.*, 280 N.L.R.B. at 670.

After analyzing the contract terms, the NLRB declared that the government "ultimately approve[d] wage and benefit levels proposed by the private employer, and thus reserve[d] to itself the ultimate discretion to determine these economic terms of employment," and therefore that the employer "lack[ed] the ability to engage in the necessary 'give and take' which is a central requirement of good-faith bargaining, and which makes bargaining meaningful." *Id.* The NLRB therefore declined to assert jurisdiction.

The D.C. Circuit has recently surveyed the NLRB's decisions in various cases in which the NLRB asserted or declined jurisdiction. "In each of the six [out of 32] cases in which the Board has declined jurisdiction, the employer's contract with the government agency set out exact levels for wages and fringe benefits, which the employer could not alter without the approval of the agency." *Human Development Association*, 937 F.2d at 662. "The Board has never declined jurisdiction under *Res–Care* where the government contract did not spell out specific wage and benefit levels. The Board has always asserted jurisdiction over employers having contracts that provided for some sort of gross payment to cover labor costs per hour or day of service provided." *Id.* at 665.

In the case at hand, the regional director of the NLRB described the contract as having provisions that "no operational changes [would] be made that affect service, scheduling, hours of operation, response times or any other characteristics of the respective transit systems without the approval" of the two contracting entities; that Mayflower would be paid "pursuant to a combination of fixed monthly rates and fixed hourly rates, with a specified maximum of vehicle revenue hours"; that the two contracting entities would not "attempt to directly discipline or terminate any of [Mayflower's] employees"; and that the two contracting entities were to be "notified of the identity of all employees hired" and could "advise [Mayflower] of any employees' inadequate performance" but that it was "left to [Mayflower] to deal with any adverse situation" and that "only

as a last and final resort" could the two contracting entities "demand that an employee be terminated," and "only upon a showing of good cause." The regional director noted that the contract specifically declares that Mayflower is in control of day-to-day operations and the employees. The regional director also commented that although the notice requesting bids on the contract required drivers' wages to fall within a certain range, the notice also stated that those ranges could be exceeded. (Our conclusion is that the ranges specified were therefore a floor for the wages to be paid to drivers under the contract.)

Finally, the regional director noted that although certain changes in wages and staffing levels were made only after negotiation between Mayflower and the two contracting entities, the contract itself has no requirement for approval by the two contracting entities of changes in wage rates. In this connection, the regional director referred to the contract provision specifying that any contract changes must be in writing; the regional director also noted that no written confirmation of any changes to the contract appears in the record. The regional director therefore stated that even though Mayflower has negotiated with the two contracting entities about changes in wage levels, that fact does not establish that Mayflower lacks the authority to bargain meaningfully with a union about wage levels.

The regional director found, after considering all of the contract provisions, that it is Mayflower that controls the wages and benefits of its employees, that meaningful collective bargaining with a union is therefore possible, and, accordingly, that the assertion of jurisdiction by the NLRB is appropriate. The three-member panel of the NLRB found that Mayflower had alleged no circumstances that required reexamination of that conclusion by the regional director.

On appeal, Mayflower argues that the regional director's conclusion about Mayflower's ability to bargain collectively with a union is wrong—that the contract so constrains Mayflower that it has effectively

been deprived of that power. Mayflower also contends that the court must consider not only the control implemented by the contract but also the control effected by the day-to-day practices of the parties. Specifically, Mayflower points to the contract language allowing the two contracting entities to demand the reassignment or termination of an employee and an incident when Mayflower wanted to transfer an employee, but did not after the two contracting entities objected. Mayflower also asserts that it has never negotiated about changes in wage levels but instead proposes certain changes, which the two contracting entities then approve or disapprove.

The NLRB argues that the contract contains no restrictions on the wages to be paid to mechanics and only a floor on drivers' wages, that it is Mayflower that decides what benefits will be offered, and that the right of the two contracting authorities to demand the dismissal of an employee does not alter Mayflower's substantial control over personnel decisions to such an extent that Mayflower has lost its autonomy over its labor relations with its employees. The NLRB further asserts that the testimony of Mayflower's senior operations manager was to the effect that proposals as to wage changes were made as a courtesy and in deference to the two contracting authorities; the NLRB argues, consequently, that the regional director was correct to disregard Mayflower's contention that the day-to-day practices of the parties effectively give control over wage changes to the two contracting entities.

We agree with the NLRB, which has itself found that even where the contracting entity has some control over wage rates, an employer is not necessarily precluded from meaningful collective bargaining with a union over economic conditions. *See Community Transit Services, Inc.*, 290 N.L.R.B. 1167 (1988); *see also National Labor Relations Board v. Kemmerer Village, Inc.*, 907 F.2d at 664, and *National Labor Relations Board v. Parents and Friends*, 879 F.2d at 1454. The contract here does not contain the kind of line-by-line veto power often cited by the NLRB when it declines to assert jurisdiction. *See,*

*e.g., Southwest Ambulance of California, Inc.,* 295 N.L.R.B. 125 (1989), and *Res-Care, Inc.,* 280 N.L.R.B. at 670. Nor do we think that the occasional consultation between Mayflower and the contracting entities concerning the execution of the contract has effected an alteration of it so as to give essential operating powers to the contracting entities. In the circumstances of this case, we do not believe that the NLRB abused its discretion in asserting jurisdiction over Mayflower's labor relations with its employees.

## II.

The NLRB has considerable discretion in determining an appropriate bargaining unit. Its determination will be upheld on review as long as there is substantial evidence on the record as a whole to support the determination and unless the NLRB acted arbitrarily or capriciously. *See, e.g., National Labor Relations Board v. Target Stores, Inc.,* 547 F.2d 421, 423 (8th Cir.1977). The NLRB may choose among several appropriate combinations of employees. *See, e.g., Arlington Hotel Company, Inc. v. National Labor Relations Board,* 712 F.2d 333, 336 (8th Cir. 1983). "In ascertaining the scope of an appropriate unit, permissible factors to be considered include company organization, physical distribution of employees, supervision, job functions, skills, wages, [and] working conditions." *National Labor Relations Board v. Target Stores, Inc.,* 547 F.2d at 423. Mayflower argues that even if jurisdiction is proper, the NLRB abused its discretion in placing both the drivers and the mechanics in the bargaining unit—essentially, that it was clearly erroneous to find that these two categories of employees share a community of interest.

The union originally asked for certification of a bargaining unit of dispatchers, drivers, and mechanics. The regional director of the NLRB found that although the drivers and the mechanics work under different wage scales, different benefit plans, and different immediate supervisors, the work of both categories of employees is functionally related and interdependent—

*i.e.,* the drivers operate the buses that the mechanics maintain and repair. The regional director also noted that there is some regular interaction between the drivers and the mechanics during the workday. The regional director found, however, that the eight dispatchers are more akin to supervisors. Noting that there are 60 drivers and only four mechanics, the regional director determined that it was appropriate to include the mechanics in the same bargaining unit as the drivers and to exclude the dispatchers from that unit.

Mayflower's objection to this finding is essentially a series of factual quibbles. We see nothing in Mayflower's argument that leads us to believe that the NLRB abused its discretion in adopting the conclusion of the regional director that the appropriate bargaining unit should include both the drivers and the mechanics.

## III.

The decision of the NLRB is affirmed, and the NLRB's application for enforcement of its order is granted.