# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-4057

_____

| | | |
|---|---|---|
| National Labor Relations Board, | * | |
| | * | |
| Petitioner, | * | On Petition for Enforcement of an |
| | * | Order of The National Labor |
| v. | * | Relations Board. |
| | * | |
| Young Women's Christian Association | * | |
| of Metropolitan St. Louis, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: May 11, 1998
Filed:   September 13, 1999

_____

Before BOWMAN,[1] Chief Judge, HEANEY and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

The National Labor Relations Board (NLRB) petitions this court for enforcement of its order requiring the Young Women's Christian Association of Metropolitan St. Louis (YWCA) to bargain with the Service Employees International Union (Union), the elected representative of YWCA's Head Start employees.  The YWCA, a private, not-

_____

[1]The Honorable Pasco M. Bowman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the end of the day on April 23, 1999. He has been succeeded by the Honorable Roger L. Wollman.

for-profit corporation that administers the federal Head Start program in the St. Louis County area, argues that the NLRB lacks jurisdiction over it because the federal government maintains such pervasive control over the terms and conditions of the employment of its Head Start employees that the YWCA is prevented from engaging in meaningful collective bargaining. We disagree and grant enforcement of the NLRB's order.

I.

The YWCA provides educational and social services to the St. Louis area community. Since 1991, the YWCA has administered the federal Head Start program in the St. Louis area pursuant to and in compliance with the Head Start Act, 42 U.S.C. §§ 9831-9852a (1994). The purpose of the Head Start program is to provide the "effective delivery of comprehensive health, educational, nutritional, social and other services to economically disadvantaged children and their families." 42 U.S.C. § 9831(a). The Secretary of Health and Human Services is charged with the administration of the Head Start program. The statute requires the Secretary to establish regulations governing the entities like the YWCA that administer the Head Start program, and to conduct mandatory reviews of these entities. See id. § 9836a(c). As outlined below, these regulations extensively govern and control the YWCA's operation of the Head Start program in St. Louis.

Federal regulations govern the preparation of the initial application submitted by an agency seeking a federal grant to operate a Head Start program. In its initial application, the YWCA was required to provide detailed information concerning its enrollment, the number of classes, the type of sessions to be conducted, and the hours and days to be worked by the staff. (J. A. at 31-34, 669-729.) The application includes detailed budget information concerning salaries, benefits, travel, equipment, supplies, construction and other expenses. (Id. at 669-729.) The YWCA was required to set forth positions and job classifications of its personnel, along with respective salaries

and wages. (Id. at 33-34, 699-729.) The initial application is subject to changes mandated by the government concerning the operation of the Head Start program. The Secretary mandated numerous changes in the YWCA's grant request, including changes in staff positions, salaries, and benefits. (Id. at 35-46, 730-81.) The government also establishes Head Start job classifications, imposes student-teacher ratios, and dictates how many employees may be hired to fill those positions. (Id. at 51-52.)

The Head Start program is funded by the federal government on an annual basis, and the amount of funding for a particular Head Start agency may increase, decrease, or be nonexistent for any given year. Such funding changes obviously impact the salaries and benefits that the YWCA may provide to its Head Start staff. Once the government awards a grant to a Head Start agency, the agency may not deviate from the specifications outlined in the application, absent governmental approval. Such prohibited deviations include changes in staffing, salaries, benefit levels, work schedules, and job classifications.

The government extensively regulates the compensation packages of Head Start staff members. The government mandates the salary range and job duties for Head Start program personnel. The Secretary establishes minimum and maximum salaries that the YWCA must pay its Head Start program employees. See 42 U.S.C. § 9848. When the YWCA applied for its grant to administer the Head Start program, the government mandated changes in the proposed salary ranges, including significant decreases for some positions. (J.A. at 44-46, 749-54.) The government also sets the benefit levels for Head Start personnel. For example, the YWCA was required to increase its medical care coverage for all employees from a fifty percent copayment level to an eighty percent level. (Id. at 37-38, 733, 740-41.) The government also regulates and restricts the payment of overtime to Head Start staff. (Id. at 625.) The Secretary mandates the job responsibilities and duties of Head Start personnel, including specifying the number of visits teachers must make to students' homes. (Id.

at 51, 68.) Federal law also proscribes the training each Head Start employee must be provided. (Id. at 58-59.)

The day-to-day working conditions of the Head Start staff are also governed in large part by government control. Government regulations provide a limited number of options through which Head Start services may be provided to children and families. 45 C.F.R. §§ 1306.31-.35 (1997). The YWCA has been approved by the federal government to operate both a full year, part day program and a full year, full day program. Under the full year, full day program, teachers are in the classroom with the children for a full day, five days a week. (J.A. at 60.) Under the full year, part day option, teachers are in the classroom with the children for only four days a week. (Id.) The YWCA is not allowed to deviate from these options to accommodate changes in staff scheduling unless such deviations are approved by the Secretary. (Id.) The YWCA's ability to grant vacation time and sick leave is also affected by governmental regulations proscribing student-teacher ratios and the number of days the program must be in session. (J.A. at 52.) The government also mandates how and when breaks for classroom staff are given, and regulations go so far as to dictate and control the physical arrangement of classrooms. (Id. at 66-68, 486-551.) Federal regulations also grant parents the absolute right to observe classroom sessions and to volunteer in the classroom, notwithstanding any objections from teachers or other Head Start staff. (Id. at 486-551.)

The government also restricts the YWCA's discretion in hiring and firing individuals for Head Start staff positions. Pursuant to the statute, the Secretary establishes the qualifications of each Head Start position through federal regulations. See 42 U.S.C. § 9843a(c)(1). The YWCA's Head Start staff hiring decisions must be approved by the government-mandated Policy Council. (J.A. at 62, 250.) The Policy Council is a group of individuals, fifty percent of whom are parents of children enrolled in the local Head Start program, and fifty percent of whom are other members of the local community selected and approved by the parents of enrolled children. (Id. at 62-

63, 233-58.)  It exists entirely independent of the YWCA.  The Policy Council must also approve all Head Start staff terminations, and the Council has vetoed the YWCA's attempt to fire at least one Head Start staffer in the past.  (Id. at 65.)  All personnel policy changes, including changes in work schedule and employee benefits, and the content of any grievance procedure, must be approved by the Policy Council.  (Id. at 64-65, 250.)  The Policy Council also must approve the YWCA's grant applications and any subsequent changes to the budget proposed by the YWCA.  (Id. 63-64.)  The government imposed Policy Council has substantial authority over those traditional subject areas where collective bargaining would normally operate to determine terms and conditions of employment.

Prior to 1997, the YWCA's Head Start employees were not represented by the Union.  On January 6,  1997, the Union filed a representation petition with the NLRB seeking to represent a bargaining unit of  "[a]ll full-time and regular part-time teaching assistants, nutrition aides, teachers, family service workers, health clerks and family literacy supervisors" of the Head Start program employed by the YWCA.  (J.A. at 1.) This unit includes approximately 85 employees.  The NLRB's regional director held a hearing on the representation petition on January 22, 1997.  The YWCA claimed that the NLRB did not have jurisdiction over the YWCA in its administration of the Head Start program because of the extensive governmental control over its employees' terms and conditions of employment.  The regional director rejected the YWCA's claim and ruled that the NLRB had jurisdiction over the YWCA.  On February 13, 1997, the YWCA filed a request for review of the regional director's decision with the NLRB, contending that the NLRB lacked jurisdiction over the YWCA.  The NLRB summarily denied the YWCA's request for review on a 2-1 vote, with member Higgins dissenting and indicating he would grant review on the jurisdictional issue.

On February 28, 1997, the employees voted 52 to 29 in favor of being represented by the Union.  The NLRB certified the Union as the exclusive collective bargaining representative of the employees in March 1997.  Following this certification,

the YWCA refused to recognize and bargain with the Union, again claiming that the NLRB lacked jurisdiction over its administration of the Head Start program. The Union then filed an unfair labor practices charge, and later an amended charge, with the NLRB, claiming that the YWCA violated section 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (5), by refusing to bargain. On September 11, 1997, the NLRB ruled that it had jurisdiction over the YWCA and that the YWCA had violated section 8(a)(1) and (5) of the Act by refusing to bargain. See Young Women's Christian Ass'n, 324 NLRB No. 64 (1997). The NLRB ordered the YWCA to bargain with the Union. Id. The NLRB seeks enforcement of this order.

II.

The YWCA's only argument against enforcement of the NLRB's order is that the NLRB lacks jurisdiction over it. The YWCA argues that because the federal government maintains such pervasive control over the Head Start program employees' terms and conditions of employment, the YWCA is prevented from engaging in meaningful collective bargaining. The YWCA claims that its inability to engage in meaningful collective bargaining frustrates the purposes and policies underlying the Act and prevents the YWCA from being subject to the jurisdiction of the NLRB.

We will enforce the NLRB's order if the NLRB has "correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Pace Indus., Inc. v. NLRB, 118 F.3d 585, 590 (8th Cir. 1997) (internal quotations omitted), cert. denied, 118 S. Ct. 1299 (1998). The NLRB has "broad authority to construe provisions of the Act," and we will defer to NLRB decisions that are "not irrational or inconsistent with the Act." NLRB v. Financial Inst. Employees, 475 U.S. 192, 202 (1986). However, such deference "'cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption . . . of major policy

-6-

decisions properly made by Congress.'" Id. (quoting American Ship Building Co. v. NLRB, 380 U.S. 300, 318 (1965)) (alteration in original).

Section 2(2) of the Act provides in relevant part that "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof." 29 U.S.C. § 152(2). The Act grants the NLRB discretion to decline jurisdiction over any labor dispute where, in its opinion, "the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." Id. § 164(c)(1). The NLRB has the initial responsibility for determining who is an employer for purposes of the Act, and we must accept the NLRB's determination "if it has a reasonable basis in the evidence and is not inconsistent with the law." NLRB v. E.C. Atkins & Co., 331 U.S. 398, 403 (1947).

Over the past two decades, the NLRB has changed the standard it uses to determine whether it will assert jurisdiction over a private company that contracts with a governmental entity exempt from the Act. At one time, the NLRB used the so-called "intimate connection" test in which it declined to assert jurisdiction over a private employer that performed functions that were intimately related to traditional government functions of the exempt entity. See Rural Fire Protection Co., 216 NLRB 584 (1975). The NLRB later abandoned the intimate connection test and replaced it with the "control test" articulated in National Transportation Service, 240 NLRB 565 (1979). The control test required the NLRB to determine whether a private employer retained sufficient control over the employment conditions of its employees to enable the private employer to engage in effective or meaningful collective bargaining with a labor organization. If such meaningful bargaining could not take place, then the NLRB would decline to assert jurisdiction over the private employer. This test was clarified by the NLRB in Res-Care, Inc., 280 NLRB 670 (1986), in which the NLRB explained that it would examine both whether the private employer retained control over the

"essential terms and conditions of employment" and whether the private employer retained control over those areas of "an employer's labor relations" that are sufficiently important for meaningful collective bargaining. 280 NLRB at 672-74. Most recently, in Management Training Corporation, 317 NLRB 1355 (1995), the NLRB abandoned the control test and announced that it would assert jurisdiction over a private employer subject to control by an exempt governmental entity if the private employer meets the definition of employer under the Act and satisfies the applicable monetary jurisdictional standards. Thus, the NLRB now no longer examines whether a private employer is able to engage in effective or meaningful collective bargaining when asserting jurisdiction.

In this case, the NLRB ruled that the YWCA met the definition of employer under the Act and that it satisfied the applicable monetary jurisdictional standards. Thus, the NLRB asserted jurisdiction over the YWCA. In urging us to enforce its order, the NLRB first claims that the YWCA qualifies as an "employer" as that term is defined in the Act. See 29 U.S.C. § 152(2). Second, the NLRB argues it properly exercised its discretion under the Act in promulgating the Management Training rule, and that it correctly applied the rule in asserting jurisdiction over the YWCA. In making its second argument, the NLRB relies heavily upon three recent decisions of the Fourth, Sixth, and Tenth Circuits upholding the NLRB's discretion to exercise jurisdiction over private employers pursuant to the Management Training rule. See Aramark Corp. v. NLRB, 179 F.3d 872 (10th Cir. 1999) (en banc); Pikeville United Methodist Hosp. v. NLRB, 109 F.3d 1146 (6th Cir.), cert. denied, 118 S. Ct. 557 (1997); Teledyne Econ. Dev. v. NLRB, 108 F.3d 56 (4th Cir. 1997).

In Teledyne, the Fourth Circuit rejected the government contractor's argument that the NLRB is bound by section 2(2) of the Act "to extend the governmental exemption to private employers where an exempt governmental entity effectively controls the basic terms of employment." 108 F.3d at 58. The court held that the Management Training rule is a valid exercise of the NLRB's discretion under the plain

language of the Act because section 2(2) does not compel the NLRB to recognize such an exemption. Id. at 59. The court next rejected the contractor's argument that the Management Training rule should be struck down because it is inconsistent with the polices underlying the Act, including the possibility of effective collective bargaining over the terms and conditions of employment. Id. at 60. The Fourth Circuit reasoned that "Congress has left this particular judgment to the [NLRB's] discretion," and that the NLRB had exercised that discretion in a rational manner. Id.

Similar to Teledyne, in Pikeville United Methodist Hospital, the Sixth Circuit rejected a private hospital's argument that the NLRB was without authority to abandon the control test articulated in Res-Care. 109 F.3d at 1152. The court held that the plain language of section 2(2) allowed the NLRB to adopt the Management Training rule and its application of the rule to assert jurisdiction over the hospital was a proper exercise of the NLRB's discretion under the Act. Id. at 152-53. The court cited Teledyne in support of its holding that the control test articulated in Res-Care was not statutorily required by section 2(2). Id. at 153.

In Aramark, the Tenth Circuit en banc, following Teledyne and Pikeville, overruled its prior line of authority and held that the plain meaning of Section 2(2) permitted the Board to exercise jurisdiction over a government contractor without regard to whether or not the government contractor had sufficient control over its labor relations to enable it to bargain effectively with a labor union. See 179 F.3d at 878.

We find ourselves in agreement with the opinions of our sister circuits on the issue of whether or not the Board can assert jurisdiction over an employer without regard to whether or not the employer's control over its ability to collectively bargain is hampered or impeded by the employer's operating agreement with the government. The statute is plain. As the Fourth Circuit held in Teledyne,

> By its terms, section 2(2) exempts only government entities or wholly owned government corporations from its coverage - not private entities acting as contractors for the government.
>
> . . . .
>
> Congress could not have intended to compel the Board to decline jurisdiction over private employers based upon constraints that their government contracts might impose upon the collective bargaining process. If it had so intended, it would have exempted private contractors as well as government entities from the Act.

108 F.3d at 59.

We also agree with the Tenth Circuit's assessment that the Board has broad discretion to determine whether or not it will exercise its statutory jurisdiction in a particular case under § 14(c)(1) of the Act, 29 U.S.C. § 164(c)(1), and that the "Board's consistent view that government contractors fall outside of § 2(2)'s political subdivision exemption and inside that provision's definition of employer is 'entitled to great respect.'" Aramark, 179 F.3d at 879 (quoting NLRB v. National Gas Utility Dist., 402 U.S. 600, 605 (1971)). Accordingly, we hold that the Board acted within its authority when it abandoned the control test of Res-Care and announced in Management Training its new intent to look only at the plain jurisdictional requirements of the statute.

Under the Act, an employer is required to bargain in good faith with its employees' representative. 29 U.S.C. § 158(a)(5). This requirement includes the obligation to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." Id. § 158(d). Because the duty to bargain in good faith extends to each and every subject embraced within this statutory phrase, it is an unfair

labor practice for an employer to refuse to bargain about such subjects. NLRB v. Katz, 369 U.S. 736, 742-43 (1962).  An employer must also come to the bargaining table with the authority to consummate a deal, or risk penalties for its failure to do so.  See Cablevision Indus., 283 NLRB 22 (1987).  This is because it has long been understood that "the purpose of collective bargaining is to produce an agreement and not merely to engage in talk for the sake of going through the motions."  Herbert Harvey, Inc. v. NLRB, 424 F.2d 770, 775 (D.C. Cir. 1969).  The YWCA argues that it simply does not have the control over employment terms and conditions that is necessary to be able to come to the bargaining table with the authority to produce an agreement, and that the entities that do have that necessary and fundamental control--the federal government acting through the Department of Health and Human Services and its regulatory creation, the independent Policy Council--cannot be forced to the bargaining table.

The YWCA also argues that existing Eighth Circuit precedent requires the NLRB to consider whether or not an employer is so restrained by its government contract that it is not able to bargain effectively with a labor organization, and that in this circuit it is an abuse of discretion for the Board to assert its jurisdiction when the employer is so restrained.  See Mayflower Contract Servs., Inc. v.  NLRB, 982 F.2d 1221 (8th Cir. 1993).  In Mayflower, a private, for profit bus company provided contract transit bus services to a nonprofit California corporation, which in turn provided transportation services for the elderly and the disabled in particular.  See id. at 1222.  The nonprofit corporation was funded by a joint municipal venture (composed of four California cities) and the federal government.  When the private bus company's drivers, dispatchers, and mechanics formed a union, which the NLRB recognized, the bus company refused to bargain with the union, claiming its bargaining hands were tied by its contract with the exempt governmental subdivisions.  Citing as examples a Supreme Court case and two other Eighth Circuit cases where a similar assertion had been advanced, our court stated, "If Mayflower has in fact effectively been deprived of that power [to bargain effectively] by its contract with the two exempt entities, then it would be an abuse of discretion for the NLRB to assert jurisdiction over Mayflower's

-11-

labor relations with its employees." Id. at 1223. The court discussed at some length the NLRB's Res-Care case, and also cited to the NLRB's National Transportation case, and ultimately determined that the bus company was not so restricted by its contract, and enforced the NLRB's order requiring the private bus company to bargain with the union. Our court also held that review of the NLRB's assertion of jurisdiction was "fact-intensive" and had to be done on a case-by-case basis. Id.

Our pre-1995 government contractor cases, including Mayflower, St. Jude Indus. Park Bd. v. NLRB, 760 F.2d 223 (8th Cir. 1985), and NLRB v. St. Louis Comprehensive Neighborhood Health Center, Inc., 633 F.2d 1268 (8th Cir. 1980), which indicated that the Board could abuse its discretion by exercising its jurisdiction over employers who could not effectively bargain because of the contractual constraints imposed by exempt governmental entities were all premised on the Board's then existing control test. The Board's abandonment of the control test in Management Training, a change we have now held the Board is permitted to make, and one which we are obligated to observe and apply, is a supervening event which, in our view, means that our prior cases no longer control the issues in this case. We also agree with the Fourth and Tenth Circuits that the Supreme Court did not incorporate the control test into the Act in its decision in NLRB v. E.C. Atkins & Co., 313 U.S. 398 (1947). See Teledyne, 108 F.3d at 59 n.2, and Aramark, 179 F.3d at 879-80. Consequently, we see no need to determine whether the Board abused its discretion in this case by exercising its jurisdiction over the YWCA.

III.

Accordingly, we grant enforcement of the Board's order.

-12-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.