Public Employee Labor Relations Board
No. 2005-627

## APPEAL OF PINKERTON ACADEMY
### (New Hampshire Public Employee Labor Relations Board)

Argued: June 8, 2006
Opinion Issued: February 21, 2007

2

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Linda S. Johnson* and *Cathryn E. Vaughn* on the brief, and *Ms. Johnson* orally), for the petitioner.

*James F. Allmendinger*, of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for respondents Pinkerton Academy Teachers Association and NEA-New Hampshire.

BRODERICK, C.J. The petitioner, Pinkerton Academy (Pinkerton or the Academy), appeals an order of the New Hampshire Public Employee Labor Relations Board (PELRB) asserting jurisdiction over an unfair labor practice complaint against the Academy filed by the respondents, who are two Pinkerton teachers, the Pinkerton Academy Teachers Association and NEA-New Hampshire. Because exclusive jurisdiction over the complaint at issue lies with the National Labor Relations Board (NLRB or Board), we vacate the order of the PELRB and remand with instructions to dismiss the complaint.

## I

Pinkerton Academy was organized in 1814 as a nonprofit organization. The Academy operated as an independent day and boarding school until 1948. Beginning in 1949, Pinkerton entered into a contractual agreement with the Derry School District to provide high school education to students from Derry. Pinkerton currently has long-term contracts to provide high school education to students from the school districts of Derry, Chester and Hampstead.

In November 2004, the respondents filed an unfair labor practice charge against the Academy with the PELRB. NEA-New Hampshire also filed a petition for declaratory judgment, asking the PELRB to decide whether Pinkerton is a public employer subject to the PELRB's jurisdiction. In May 2005, the PELRB determined that the Academy is a "quasi-public corporation" subject to its jurisdiction. Pinkerton appealed. Following oral argument, we ordered supplemental briefing on an issue not addressed below: whether the National Labor Relations Act confers exclusive jurisdiction over this dispute to the NLRB.

## II

The National Labor Relations Act (Act) provides that

> [t]he Board is empowered ... to prevent any person from engaging in any unfair labor practice ... affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided,* That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry ... even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision

of this subchapter or has received a construction inconsistent therewith.

29 U.S.C. § 160(a). "By this language ... Congress meant to reach to the full extent of its power under the Commerce Clause." *Guss v. Utah Labor Board*, 353 U.S. 1, 3 (1957) (quotation omitted). "The Board, however, has never exercised the full measure of its jurisdiction." *Id.* "For a number of years, the Board decided case-by-case whether to take jurisdiction." *Id.* "In 1950, concluding that experience warrants the establishment and announcement of certain standards to govern the exercise of its jurisdiction, the Board published standards, largely in terms of yearly dollar amounts of interstate inflow and outflow." *Id.* at 3-4 (quotation omitted).

In 1957, noting that the Board's standards left an unknown number of labor disputes "in the 'twilight zone' between exercised federal jurisdiction and unquestioned state jurisdiction," *id.* at 4, the United States Supreme Court addressed the question "whether Congress, by vesting in the [NLRB] jurisdiction over labor relations matters affecting interstate commerce, has completely displaced state power to deal with such matters where the Board has declined or obviously would decline to exercise its jurisdiction but has not ceded jurisdiction [under the Act]." *Id.* at 2-3. The Court held that even if the NLRB declined to exercise jurisdiction in its discretion, State courts and agencies could not exercise jurisdiction over matters placed within the competence of the NLRB. *Id.* at 9-10. The Court stated that "Congress knew full well that its labor legislation preempts the field that the act covers insofar as commerce within the meaning of the act is concerned." *Id.* at 9-10 (quotation omitted). Recognizing that its decision created "a vast no-man's-land, subject to regulation by no agency or court," in those cases in which the NLRB declined to exercise jurisdiction in its discretion, the Court invited Congress to "change the situation." *Id.* at 10, 11.

In 1959, Congress responded by passing section 14(c) of the Act. *See* 29 U.S.C. § 164(c). The statute provides in paragraph (1) that the NLRB may "in its discretion ... decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." 29 U.S.C. § 164(c)(1). Paragraph (2) provides that federal law shall not be deemed to preclude "any agency or the courts of any State ... from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction." 29 U.S.C. § 164(c)(2).

The United States Supreme Court subsequently clarified the extent of federal preemption over labor disputes. "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [the Act], . . . due regard for the federal enactment requires that state jurisdiction must yield." *San Diego Unions v. Garmon*, 359 U.S. 236, 244 (1959). Even when it is not clear whether a particular activity regulated by a state is governed by the Act, "courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board." *Id.* at 244-45.

"Although a state court may assume jurisdiction over labor disputes over which the National Labor Relations Board has, but declines to assert, jurisdiction, . . . there must be a proper determination of whether the case is actually one of those which the Board will decline to hear." *Radio Union v. Broadcast Serv.*, 380 U.S. 255, 256 (1965) (citation omitted). "While the language of Section 14(c) does not compel the Board to assert jurisdiction, it does manifest a congressional policy favoring such assertion where the Board finds that the operations of a class of employers exercise a substantial effect on commerce." *Cornell University*, 183 N.L.R.B. 329, 332 (1970). The task before us, therefore, is to determine whether the case at issue is one the Board would decline to hear.

## III

"[T]he Board may exercise its broad statutory jurisdiction whenever an employer has more than a de minimus impact on the flow of interstate commerce." *YMCA of the Pikes Peak Region, Inc. v. N.L.R.B.*, 914 F.2d 1442, 1447-48 (10th Cir. 1990) (quotation omitted). Section 2(2) of the Act defines an "employer" as

> any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, . . . or any labor organization.

29 U.S.C. § 152(2). The Board has noted that Congress' rejection in 1947 of proposals to specifically exempt from the Act "broad classes of charitable or nonprofit organizations seems to indicate that Congress was content to leave to the Board's informed discretion in the future as it had in the past, whether and when to assert jurisdiction over nonprofit organizations whose operations had a substantial impact upon interstate commerce." *Cornell University*, 183 N.L.R.B. at 331.

## A

In 1970, pointing to what it saw as an increased involvement in commerce by educational institutions, the NLRB held that "the Board has statutory jurisdiction over nonprofit educational institutions whose operations affect commerce." *Id.* at 331 (overruling *Columbia University*, 97 N.L.R.B. 424 (1951)). The Board was "convinced that assertion of jurisdiction is required over those private colleges and universities whose operations have a substantial effect on commerce to insure the orderly, effective, and uniform application of the national labor policy." *Id.* at 334. Thus the Board determined that it would "no longer decline to assert jurisdiction over such institutions as a class." *Id.* at 331. Pursuant to the Code of Federal Regulations, the NLRB "will assert its jurisdiction in any proceeding arising under sections 8, 9, and 10 of the Act involving any private nonprofit college or university which has a gross annual revenue from all sources . . . of not less than $1 million." 29 C.F.R. § 103.1 (2006).

One year after *Cornell* was decided, the NLRB extended its holding in that case to private nonprofit secondary schools. *See Shattuck School*, 189 N.L.R.B. 886 (1971). The NLRB asserted jurisdiction over a nonprofit Minnesota corporation operating a secondary boarding school that had gross revenues of approximately $1,174,000 per year and annual purchases of more than $71,000 in goods from outside Minnesota. *Id.* at 886. The Board noted that the employer's operations were not expressly covered by the standards set out in 29 C.F.R. § 103.1, under which the Board asserted jurisdiction over private nonprofit colleges and universities. *Id.* Nonetheless, the Board stated that "the Employer is a private nonprofit educational institution which, we find, is sufficiently similar to warrant assertion of jurisdiction under the same jurisdictional standard." *Id.* "The Board now asserts jurisdiction over all private, nonprofit, educational institutions with gross annual revenues that meet its jurisdictional requirements." *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 497 (1979). Thus the Academy's status as a private nonprofit secondary school does not in itself preclude NLRB jurisdiction.

## B

The main legal issue before us is whether Pinkerton Academy is a "political subdivision" exempt from the Act's coverage, as that term has been defined by the NLRB. In 1971, the United States Supreme Court approved the Board's interpretation of the jurisdictional exemption for "political subdivisions" as contained in section 2(2) of the Act. *N.L.R.B. v. Natural Gas Utility District*, 402 U.S. 600 (1971). Under this standard, "political subdivisions" are those "entities that are either (1) created

directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *Id.* at 604-05. In *Gas Utility District*, because the Tennessee statute under which the employer utility district was organized made "crystal clear" that the employer was "administered by a Board of Commissioners appointed by an elected county judge, and subject to removal proceedings at the instance of the Governor, the county prosecutor, or private citizens," the Court held that the NLRB erred in holding that the employer "exists as an essentially private venture, with insufficient identity with or relationship to the State of Tennessee." *Id.* at 605 (citation omitted). As the Court stated: "Plainly, commissioners who are beholden to an elected public official for their appointment, and are subject to removal procedures applicable to all public officials, qualify as 'individuals who are responsible to public officials or to the general electorate' within the Board's test." *Id.* at 608.

■ Over the past two decades, the NLRB has changed the standard it uses to determine whether it will assert jurisdiction over a private company that contracts with a governmental entity exempt from the Act. Prior to 1995, the Board extended the "political subdivision" exemption to private employers providing services for exempt governmental entities where the exempt entity exercised effective control of the primary terms of employment. *See Res-Care, Inc.*, 280 N.L.R.B. 670 (1986). In *Management Training Corp.*, 317 N.L.R.B. 1355, 1357 (1995), the Board declared it would no longer apply the *Res-Care* governmental control test. Rather, it would thereafter "only consider whether the employer meets the definition of 'employer' under Section 2(2) of the Act, and whether such employer meets the applicable monetary jurisdictional standards." *Id.* at 1358. Under the "bright-line" rule of *Management Training*, therefore, the jurisdiction of the NLRB is established simply by the minimal showing that the entity both meets the definition of "employer" under section 2(2) of the Act and meets the applicable monetary jurisdictional standards.

■ "Federal, rather than state, law governs the determination, under § 2(2), whether an entity created under state law is a 'political subdivision' of the State and therefore not an 'employer' subject to the Act." *Gas Utility District*, 402 U.S. at 602-03. "[I]t is to the actual operations and characteristics" of the employer that the Board must look in deciding whether an entity is exempt from the Act's coverage as a political subdivision. *Id.* at 604 (citation omitted). "[R]eview of the NLRB's assertion of jurisdiction [is] fact-intensive and [must] be done on a case-by-

case basis." *N.L.R.B. v. Young Women's Christian Ass'n*, 192 F.3d 1111, 1119 (8th Cir. 1999) (citation omitted).

The Pinkerton Academy Teacher's Association argues that two recent cases, *Los Angeles Leadership Academy*, No. 31-RM-1281 (N.L.R.B. Region 31 March 2, 2006), *cert. denied*, (N.L.R.B. May 17, 2006), and *Education for Change*, No. 32-RM-801 (N.L.R.B. Region 32 May 9, 2006), which held that charter schools established under California law qualified as exempt political subdivisions under the Act, "make it fair to say that the NLRB would not assert jurisdiction over Pinkerton." We do not agree. A close reading of these regional directors' decisions reveals material differences between the California charter schools and Pinkerton Academy. We conclude that, as a matter of law, Pinkerton Academy is a nonprofit educational institution over which the NLRB has jurisdiction, rather than an exempt political subdivision.

▉ There are three factors the NLRB has consistently relied upon in determining whether an employer is a political subdivision and thereby exempt from coverage under the Act. The first factor is whether special legislation was required to create the employer. *See Research Foundation of the City Univ. of NY*, 337 N.L.R.B. 965, 968 (2002); *Hinds County Human Resource Agency*, 331 N.L.R.B. 1404, 1404 (2000); *University of Vermont*, 297 N.L.R.B. 291, 295 (1989); *Truman Medical Ctr., Inc. v. N.L.R.B.*, 641 F.2d 570, 572 (8th Cir. 1981). The second factor is whether individuals on the employer's board of trustees are appointed by, or are subject to removal by, government officials, and whether the board includes government officials as members. *See Shelby County Health Care Corp.*, 343 N.L.R.B. No. 48 (2004), 2004 WL 2461368, at *24-*25; *Enrichment Services Program, Inc.*, 325 N.L.R.B. 818, 819 (1998); *University of Vermont*, 297 N.L.R.B. at 294; *Rosenberg Library Assn.*, 269 N.L.R.B. 1173, 1175 (1984); *Truman Medical Ctr.*, 641 F.2d at 573. The third factor is whether the employees may participate in a state-sponsored pension system. *See Shelby County*, 2004 WL 2461368, at *26; *Hinds County*, 331 N.L.R.B. at 1405; *Jervis Public Library Association, Inc.*, 262 N.L.R.B. 1386, 1387 (1982). While each case is unique and there are numerous additional factors which may be taken into consideration, these three factors present a common theme throughout many of the Board's decisions.

As explained in *Los Angeles Leadership Academy*, charter schools may be created pursuant to California legislation enacted in 1992 authorizing their establishment. *L.A. Leadership Academy*, slip op. at 4-5. The state statute "establishes the rights and obligations of [the charter schools'] operators, personnel and pupils." *Id.* at 5. The statute provides for public

funding and governmental oversight and declares that charter schools are part of the public school system as defined in the state constitution. *Id.* Pre-existing private schools are prohibited from obtaining a charter. *Id.* at 4. To operate a charter school, its developers must submit a petition for approval to one of three chartering authorities: (1) the State Board of Education; (2) a county office of education; or (3) the school district in which the charter school will be located. *Id.* at 5-6. To be approved, a charter school petition must address sixteen elements required by the authorizing legislation. *Id.* at 6. These sixteen elements encompass such factors as: a description of the proposed educational program; the educational outcomes that the charter operators commit to achieving and how that academic success will be measured; the governance structure of the charter school itself; the student suspension and discipline policies; whether the charter school will handle its own labor relations or delegate those to the chartering authority; and the manner in which staff will be covered by the public employee retirement system. *Id.*

> [C]harter schools are *strictly* creatures of statute. From how charter schools come into being, to who attends and who can teach, to how they are governed and structured, to funding, accountability and evaluation—the Legislature has plotted all aspects of their existence. Having created the charter school approach, the Legislature can refine it and expand, reduce or abolish charter schools altogether.

*Wilson v. State Bd. of Educ.*, 89 Cal. Rptr. 3d 745, 751 (Ct. App. 1999). Accordingly, in *Los Angeles Leadership Academy*, because the charter school could not exist but for the State's enabling legislation, it was found to be created directly by the State so as to constitute an administrative arm of the government, thereby satisfying the first common factor in determining if an employer is a "political subdivision." *L.A. Leadership Academy*, slip op. at 15.

In contrast, Pinkerton Academy was organized in 1814 as a nonprofit corporation. Although the Academy was established by a special act of the legislature, that act was simply the mechanism of incorporating a private academy in New Hampshire in the 1800s. *Cf. University of Vermont*, 297 N.L.R.B. at 295 (holding that because University was created by special act of Vermont General Assembly it constitutes a political subdivision). Nothing in the special act indicates that Pinkerton Academy was intended to operate under the control of the State of New Hampshire. *Compare Research Foundation*, 337 N.L.R.B. at 968 (nothing in corporation's charter indicated that employer was intended to operate under control of or as administrative arm of City University of New York), *with University*

*of Vermont*, 297 N.L.R.B. at 291-92 (University "shall be recognized and utilized as an instrumentality of the state for providing higher education" and the legislature shall "appropriate such sums as it deems necessary for the support and maintenance of said corporation").

Pinkerton Academy was created by private individuals who gave money and land to establish the school "for the purpose of promoting piety and virtue and for the Education of Youth in such of the liberal Arts and Sciences or Languages as the Trustees hereinafter provided shall direct." Laws 1814, ch. 18, *reprinted in* LAWS OF NEW HAMPSHIRE, VOL. 8, SECOND CONSTITUTIONAL PERIOD, 1811-1820 298 (Evans Printing Co. 1920). Pinkerton Academy operated as an independent day and boarding school until 1948. In 1949, Pinkerton entered into a contractual agreement with the Derry School District to provide high school education to students in Derry. Pinkerton is currently engaged in long-term contracts with the Towns of Derry, Chester and Hampstead. "The creation of the Employer by private individuals as a private corporation, without any state enabling action or intent, clearly leaves the Employer outside the ambit of the Section 2(2) exemption." *Research Foundation*, 337 N.L.R.B. at 968. "The plain language of Section 2(2) exempts only government entities or wholly owned government corporations from its coverage—not private entities acting as contractors for the government." *Id.* (quotation omitted).

Pinkerton Academy is not governed by a local school board nor is it part of a local school district. Pursuant to RSA 194:22 (1999): "Any school district may make a contract with an academy . . . located in this or . . . in another state, and raise and appropriate money to carry the contract into effect. If the contract is approved by the state board the school with which it is made shall be deemed a high school maintained by the district." This language does not mean that the district takes over the operation of the private academy, but rather has "the limited purpose . . . of relieving the towns from paying the tuition of students who chose to attend schools lacking town contracts." *Johnson v. Pinkerton Academy*, 861 F.2d 335, 338 (1st Cir. 1988). Although Pinkerton Academy has assumed the statutory responsibility of providing high school education for the Towns of Derry, Chester and Hampstead, it has done so pursuant to a series of contracts between the Academy and the sending districts, not pursuant to any statutory duty imposed upon Pinkerton Academy. Its contractual relations with political subdivisions of the State do not transform it into a political subdivision. *See Truman Medical Ctr.*, 641 F.2d at 572.

Unlike charter schools in California, where legislation expressly states that the government intends to retain control over them, we conclude that Pinkerton Academy was not created by the State of New Hampshire so as

to constitute an administrative arm of the government as that standard has been interpreted by the NLRB and the courts.

■ Concerning the second major factor, in determining whether an employer is administered by individuals who are responsible to public officials, the NLRB looks to whether individuals on the board of trustees are "appointed by, and subject to, removal by public officials." *Id.; see also Gas Utility District*, 402 U.S. at 605; *Research Foundation*, 337 N.L.R.B. at 969. "For an entity to be deemed 'administered by' individuals responsible to public officials or to the general electorate, those individuals must constitute a majority of the board." *Enrichment Services*, 325 N.L.R.B. at 819. In *Temple University*, 194 N.L.R.B. 1160, 1160 (1972), the Board declined to assert jurisdiction over the University because, among other things, "the board of trustees, [which] was established to manage, control, and conduct the instructional, administrative, and financial affairs of the University," included the Governor of Pennsylvania, the mayor of Philadelphia, the superintendent of public education, the president of the senate and the speaker of the house of representatives. Likewise, in *University of Vermont*, 297 N.L.R.B. at 291, the NLRB found the employer exempt from the Board's jurisdiction as a political subdivision in part because twelve of the twenty-one trustees were selected by the State, whether by legislation or by gubernatorial appointment, thereby establishing that the State clearly exercised control over the University's board of trustees. *See also St. Paul Ramsey Medical Center*, 291 N.L.R.B. 755, 758 (1988) (absent requirement that employer's board of directors be government officials or appointed by government officials or provision for removal of board members by any government official, employer was not political subdivision).

The California enabling legislation provides that the state's charter schools are "under the jurisdiction of" the public school system and "under the exclusive control of officers of the public school system." *Wilson*, 89 Cal. Rptr. 3d at 754. While the California charter schools have a board of directors, the board must comply with all laws relating to public agencies. *L.A. Leadership Academy*, slip op. at 13. The board meetings are noticed and open; the board members are selected by a nominating committee and elected by the sitting board of directors. *Id.* Parents must be represented on the board and a non-voting space is reserved for a representative of the school district. *Id.* at 14. The statute has audit, budget and financial oversight provisions, and controls the curriculum and student progress. *Id.* at 13-15. Furthermore, the state and the school district retain the ultimate power to revoke the school's charter. *Id.* at 13. Based upon these facts, the regional director concluded that the California charter schools are

"administered by individuals who are responsible to public officials or to the general electorate." *Id.* at 15.

Unlike the California charter schools, Pinkerton Academy is governed by a private board of trustees. Pursuant to the sending district contracts, a certain number of the trustees are from each of the sending districts; however, no trustee is elected or appointed by any governmental body. The decision-making authority of the Academy is not under the direct control of any municipality, school district, or group of taxpayers, citizens or voters in New Hampshire. The trustees have the power to elect future trustees, own and operate real and personal property, and transact all business necessary to run the Academy.

[8] Also unlike the California charter schools, Pinkerton Academy is not administered by individuals who are responsible to public officials or the general public as that requirement has been interpreted by the NLRB. *See Hinds County*, 331 N.L.R.B. at 1404; *Truman Medical Ctr.*, 641 F.2d at 572. Any responsibility of Pinkerton's trustees to the sending districts "derives from the *contractual* relations between [Pinkerton] and these political subdivisions, and is not the sort of direct personal accountability to public officials or to the general public required to support a claim of exemption under § 2(2)." *Truman Medical Ctr.*, 641 F.2d at 573 (emphasis added).

Employee participation in a state-sponsored or created pension system is the third significant indicator of statutory exemption under section 2(2) of the Act. *See Hinds County*, 331 N.L.R.B. at 1405. Pinkerton Academy was removed from the New Hampshire Retirement System in 1991 because it was determined that the Academy is not a "governmental entity, political subdivision, agency or instrumentality." The New Hampshire Retirement System based that conclusion upon the fact that: Pinkerton is not administered by individuals who are responsible to public officials or to the general electorate; Pinkerton is not a department or administrative arm of the government; Pinkerton enjoys financial autonomy and is not subject to the control or supervision of any governmental authority; and Pinkerton does not perform services that are traditionally within the exclusive prerogative of the government. Although a state determination that the employer is not considered to be a political subdivision is not controlling, it is to be given "careful consideration." *Gas Utility District*, 402 U.S. at 602. "[T]he Board has found the state's characterization of an entity to be an important factor in determining the more specific issue of whether the Employer was created so as to constitute a department or administrative arm of government." *Hinds County*, 331 N.L.R.B. at 1404.

■ In summary, Pinkerton Academy was not created directly by the State of New Hampshire so as to constitute an administrative arm of the State, nor is it administered by individuals who are responsible to public officials, nor do its employees participate in the New Hampshire Retirement System. Consequently, we hold that Pinkerton Academy is an employer as defined in section 2(2) of the Act. Pinkerton likewise meets the monetary jurisdictional standard as the record indicates that Pinkerton receives gross annual revenue in excess of $26 million. Because Pinkerton Academy qualifies as a nonprofit educational institution within the jurisdiction of the NLRB, we vacate the decision of the PELRB, and remand with instructions to dismiss.

*Vacated and remanded with instructions.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.